The 4th District Appellate Court of the State of Illinois has now convened, the Honorable Eugene G. Doherty presiding. Good morning all. We're calling case number 4-230366, Schultz et al. v. Sinav Ltd. et al. I should note at the outset that Justice Turner is a member of this panel, but was unscheduled, had to step away from this argument today. He will continue to be a member of the panel. He has reviewed the briefs. He will also listen to the recording of this argument. Can I ask counsel for appellate to please state your name for the record? Good morning, Your Honor. My name is Terrence Kinnaid, and I'm attorney for the Plains. And for the Appellees. Good morning, Your Honor. Good morning, Your Honor. Tom Cawley, on behalf of the individual defendants. Good morning, Your Honor. Joshua Liebman, on behalf of the investor defendants. Good morning, Your Honor. Richard Landon, on behalf of Sinav and the GTL entities. All right. The appellant's counsel may proceed. Thank you, Your Honor. May it please the Court. Today, the plaintiffs want to focus on three points. First, the trial court erroneously handled damages. Second, the trial court erred in denying leave to amend. And third, the trial court erroneously struck plaintiff's jury demand. Plaintiffs ask this court to remand for a new trial. The first point, damages. We want to highlight three errors here. The first is eliminating recissory damages. Second is eliminating disgorgement. And third are miscalculations. First, recissory. This is a form of relief that's available in Delaware for breach of duty cases like this. It is designed to put the plaintiffs who are the victims in the position that they would have been kind of but for the breaches of duty. It's more than just a redo of what went wrong and try and do it right at the time. It is assuming that the forced sale that occurred no longer is off the table. Instead, we have plaintiffs in charge of owning their shares and doing dispensing of them as they would. So the idea is not to let breachers profit from the transaction. And it is to be considered as if the plaintiffs hold their ownership interest. After the breach, the breachers do not get the benefit of arguing that the plaintiffs might have sold their shares at certain times. Delaware courts say the plaintiffs get to dictate the sale terms and when. And the plaintiffs get to select an optimal date because in this case, the plaintiffs have said that they understood what they did. They founded the most profitable ethanol plant in the country. And the plaintiffs eyed a long-term interest. It took $230 million to build this plant.   And the plaintiffs get to select an optimal date. And so the plaintiffs were expecting to hold their interest for a long time. So in this instance, the court denied and on summary judgment the opportunity to pursue recessory damages. And we say, look, the submission, we requested this recessory damages in the complaint. It was timely because it was within the statute of limitations, but also there was a triggering event that the court kind of didn't really acknowledge. The plaintiffs received an anonymous email with a valuation that was substantially higher than what they were bought out at. It alerted them that they had an opportunity to pursue rights here. And they did so promptly after receiving that email, which suggests that the request for recessory damages was timely. The defendants were years away from producing the complete evidence of their misbehavior and that continued into the litigation. And so striking it for untimeliness, we say it was error. May I ask you counsel, the trial court's decision to preclude recessory damages, would that normally be reviewed under an abuse of discretion standard? And is that any different on a summary judgment context? Your honors, we submit that this should be reviewed de novo because it was decided on summary judgment. And I suppose that the court had decided later in the case, which should have happened, the court had the option not to award recessory damages, but did not. We submit, did not have the opportunity to take it off the table in summary judgment fashion. So we say it's a de novo review. And if the court had decided it later, would it then be a matter of discretion? I think that it would have been at that point, if it had been decided at trial, yeah, we would be in here arguing manifest way to the evidence as opposed to this standard de novo. Is there any evidence that was, would have could have been presented later that wasn't known at summary judgment? Yes. There were additional facts that came forward from the defendants over the course of years. In fact, the defendants produced some of their most damning materials after the summary judgment was decided. So the answer to that question is yes. You had also filed a motion for summary judgment. Does the filing of cross motions indicate that the parties both agree that there's no material issue of fact. Not on this point, your honor, because we did not move for summary judgment on our own on accessory damages. Thank you. So after a breach, which forces a sale, we maintain the risk. The violators do not get a redo to determine what would the price be if everything was done right. Instead, the opportunity shifts to the victims. What would be the optimum date? We had put, we had made an offer of proof on what that optimum date was and what the impact on damages would be. And it was error to knock that out of summary judgment. Next we have, having, having made that communication to the court that you have identified an optimum date. If you prevailed on this, are you locked into that date? I'm going to struggle with that question, your honor, because additional evidence came in after we submitted the date. So, you know, I, I don't actually don't know the answer to that. If ethanol goes very high in the, in the markets, you're, you're still have chosen your optimal date. I would say yes, the plaintiffs can choose up to the date of trial is what the Delaware courts say. So I think that the answer is we're not locked in to the previous date that we pick. The next damages issue was disgorgement, which is related to recessory damages. It's an equitable remedy available in Delaware courts for breaches and squeeze out cases. It doesn't need to be pleaded. It's just a remedy that's available. And the trial court had no reason to rule preemptively that it does not apply. There was a concern that the trial court noted about double recovery, but here in this case, the evidence showed that the four individual defendants and some of their wives received about $13 million for their collective 10% interest in the enterprise. That was an interest that was roughly equivalent to the plaintiff's interest that was taken away. It was essentially shifted over to the, the four individual defendants and their families. So until any award exceeds $13 million, there is no disgorgement and without disgorgement, the breachers improperly get to enjoy the benefits of their breaches. We did highlight the cases under Delaware law, which says that it's a public policy matter. When you breach, you do not get to enjoy benefits of the breach. And until that's disgorge that they do, there are many ways that it could be disgorge. The award itself could have exceeded the amount, and that would have disgorge in this case that didn't happen. So we submit that taking that off the table before at the summary judgment stage was error. Our third point on damages about miscalculation, the trial court forced the parties to conduct a limited trial for a reevaluation at the court's chosen date, February 22, 2012. We submit that was error in and of itself to select that date in light of what we've said about recissory damages. After a breach, the breachers, the Delaware does not give the breachers a redo on their preferred date. So all the parties maintain that at the trial, the court erred in its damages analysis. Some say the trial court failed to focus sufficiently on a prior transaction. The parties do not agree on which evidence the court should have relied, but the parties agree that the court disregarded the evidence. In particular, the trial court requested expert testimony and then disregarded it to calculate a number that the court likes even defended. A court isn't obligated to accept the testimony of an expert, right? I mean, even though the court may have asked for it, it could not have been persuasive. It is not obligated to accept the testimony as to the numbers. But in this case, we're going to talk about some things that the court just, there was no evidence to support a calculation. Here's a, for instance, the discount factor is the most important calculation in this matter. There was only testimony from one expert and one person. The only evidence came from the plaintiff's expert as to the components of that, as to the dates that the court set. And the court instead went back to an old, what we call SRR, one of the evaluators that the defendants chose back in 2012, an old report and just selected that discount rate, which included acknowledged outdated factors because it was dated in August. And the factors had changed by the undisputed testimony from the experts. So in that sense, the court's not obligated to accept the amounts, maybe that the experts come up with and the court can do things, but to just absolutely do something that's disregards the manifest way of the court, which is to say that there's no evidence to support a calculation. And the only evidence to support a calculation was error. And in fact, even defendant GTL said it in its reply that the trial court really reverse engineered to match a value that appeared in a draft valuation from 2011. So we think the, the error is, is highlighted here. The SRR report was in evidence, correct? It was without any supporting testimony, but no one objected to its admission. No one objected to a submission. So the trial court can base its decision on evidence that is admitted. And this was admitted. It was admitted. However, it was dated August 31. The court purported to be valuing as of 2012 and February. And the only evidence supported that these discount factors, which were the primary drivers of the numbers, there are several components that were outdated. It changed from August of 2011 to February of 2012. There's no contrary testimony. And while I assume your experts would have said as much, the trial court was free to disregard their opinion on that. Is that fair? I do not believe it's fair for them to disregard opinion because just fact it's dates and it's government input numbers that go into discount factors. It's, it's, it's not an, it wasn't his opinion. It was actual supported fact by government records as to what these factors were that impacted the discount rate. So an SRR used exactly the same materials. They cited the sources. And then the expert at trial said, we're going to go to the same sources and use the new date that the court had did not use those numbers. It went backward to do it. It was inapplicable. And we say that that's against the manifest way. What about the fact, going back to recissory damages that the trial court said at the 2020 trial that it considered the other evidence received then, and it still would stick with that decision of not awarding recissory damages. Does that then take it out of the summary judgment standard of review because the judge sort of reaffirmed that holding after more evidence was received at trial? Of course, the planners do not believe so because that was stricken and no longer in available to be pursued. And the real error there was on ruling that our timing was improper. And that was the main basis for striking the damages. We'd say that, you know, the timing is appropriate under Delaware law and that should be reviewed to know, but we continue to maintain. So if we, I think I have a few minutes left and I confess, I'm not sure if there's a system for telling me how much time, but we don't want to talk. Notified when the bailiff square turns red, you'll see it first a two minute warning and then a, a timeout one. All right. Thank you, your honor. I'll move on to the second major point of our argument, which is leave to amend. We we properly pursued an amendment to declare the transaction void based on newly discovered evidence that came out during discovery. When we moved for that, we acknowledged the Loyola factors from the Illinois Supreme court, lead to a man is supposed to be freely given. And by rule that can happen before or after summary judgment. And it was error to deny that. And it was abusive discretion at the time for the, that we submitted the motion for leave. There was no trial date set. There was no discovery cutoff. The full trial was years away. There was no prejudice. It was timely in the context, because as soon as we got the, the new evidence, we presented to presented it to the court in a motion that said, this is significant. And this impacts some new rights, the court after a series of motions. And there were some timing delays from court administration perspective of how long things took to rule that basically said, well, I'm going to need you to submit a new pleading on this, which we did. And then he denied it after a lengthy review process and said it was untimely. So with all of that under the circumstances, we say that given how freely these things are supposed to be granted and the timing of it, in light of the history of the case was, was error. It's a significant claim. The, the, the transaction could be determined to be void based on the manipulation of the independent directors. And that is obviously something that is significant to the defendants. They're very concerned that this thing could could come undone, but it is a legitimate claim given the way the independent directors were removed without following the proper procedures. So it could result in everyone being restored to their ownership positions before the void transaction. Our final point is concerns that striking of the jury trial, the plaintiffs properly requested a jury trial for their tort claim against the interfering defendants. The LLC agreement we acknowledge excludes and waives jury trials that's into the contract. However, we asserted our jury trial claim on the Illinois tortious interference claim against parties who are not signatories to the contract. So there's a set of defendants here today that their only argument that concerns this jury trial issue. There hasn't been an Illinois court, which has allowed strangers to a contract to benefit from a jury waiver. We relied extensively on the Kohler decision that all parties discussed below and in the appellate briefs. And that decision highlights that if you're not a party to the contract, you cannot gain the benefits associated with that contract. We say that this interference tort deserves a jury trial under Illinois law. We were denied that. And that was a significant, we say it makes a difference. The trial court denied the directed finding at the conclusion of the plaintiff's case. A jury could well have reached a different conclusion on liability. So I take it because you've referenced Illinois law a couple of times. I take it that your position would be that both determining whether there is a right to a jury trial and determining whether it's been contractually waived are decided under Illinois law. We do maintain that it should be that, and that's how the parties pursued it below throughout. But even under Delaware law, there is no controlling authority, which says that non parties to a contract can take advantage of a jury waiver within a contract. The other side does cite a couple of trial court opinions that are not published in any official reporter, but those are not controlling decisions in Delaware. I don't think that the law that applies matters much for this question, but we do maintain that Illinois law does apply and that Illinois courts have never granted non parties to contracts, the opportunity to take advantage of a jury waiver clause for the independent tort of interference with contract, which Illinois recognizes. So if there are no further questions in conclusion, I would just say that the plaintiff's request that this court reverse the trial court for the reasons that we've stated here and in our briefs and that this court remand for a new trial. Thank you, Your Honors. All right. Thank you. I believe it's Mr. Cawley next. That's right, Your Honor. Thank you, Your Honor. May it please the court, Tom Cawley on behalf of the individual defendants. Your Honors, I'd like to back up and talk about the liability issue for the individual defendants, which was the basis of our appeal. The circuit court improperly granted summary judgment against the individual defendants on liability and the court reviews that summary judgment ruling de novo. The summary judgments in Illinois are appropriate only when there are no title to judgment as a matter of law. The circuit court here improperly granted plaintiff's motion for summary judgment liability by making credibility determinations, weighing evidence, resolving factual disputes against the individual defendants. Moreover, the circuit court improperly decided the individual defendants intent. The court determined on multiple occasions, I think we counted and we have in our brief like nine times, that the individual defendants willfully and intentionally dealt unfairly with the plaintiffs. And the Illinois courts have consistently held that it is particularly inappropriate to decide issues of intent on summary judgment. In addition, on summary judgment evidence is to be construed strictly against the movement. And here, the circuit court ignored or disregarded evidence that the individual defendants clearly presented on summary judgment. Most striking in our view is the court disregarded the uncontroverted affidavits of the individual defendants. And I say they're uncontroverted because their depositions were never taken. The only statement before the court at the time of the summary judgment ruling was, were the affidavits of the individual defendants. And the circuit court said in connection with one affidavit from defendant LeMessurier that he found the affidavit unpersuasive. And it was on the, on the key point in the case below. And it's whether the, the individual defendants had a material conflict. Mr. LeMessurier said that he explained why he did not believe an email. There was an email that is the basis of all this, which I'll get to in a moment. And he said that the email should be, was being misconstrued by the plaintiffs. And this, the court said he found the affidavit unpersuasive as it relates to the conclusion the court reached that the defendants willfully failed to deal fairly with the plaintiffs. And there were also four uncontested affidavits from each of the individual defendants. And in those affidavits, they said that they relied upon a well-respected law firm, Safer Shaw and on a well-respected valuation form, SOR throughout the buyout process. And there's no controversy, there's no evidence to controvert that. And the court ignored that. The court also ignored the statement by the Safer Shaw attorney at the time of the minority buyout. There are minutes of the minority buyout that were taken by the plaintiffs. And at that minority buyout meeting on January 30th, 2012, the Safer Shaw lawyer said the $1.10 price was fair. And the court completely ignored that. There is no evidence that, and your honor, that this is particularly inappropriate with respect to defendants Kwasniewski and Jekyll. They had only been placed on the IREH board 10 days before the buyout. They had nothing to do with the planning or execution of the buyout. They relied completely on the Safer Shaw attorney. They relied upon the SRR valuation, and they were not involved in the process, the documents that the plaintiff cite don't have their names on them. They were certainly aware that there was the potential of a buyout, but as far as the process wasn't. On that point, counsel, isn't it, isn't it reasonable to say that a unilateral expectancy, meaning not promised by anybody, but unilaterally anticipated, can that not constitute a material conflict of interest? Well, unilaterally anticipated what? First of all, the word. How about something in the nature of what they received? Well, right. What they received, right. But at the time they voted, number one, at the time they voted on this, there was no promise. There was no communications with the. And that's what I'm, that's what I'm asking. But if they reasonably anticipate, even if it's not promised because they think it is, it is common in this type of transaction, isn't that a potential conflict? Well, it's potential conflict is in, but the contract speaks to that. Your Honor, there's a provision in the contract that there's, if there's a material conflict or the potential to have a conflict that if it's, if it's disclosed, then you can vote. And the idea that there was the documents that were publicly available. How can they both not know about it and disclose it? Well, your Honor, what the trial court held is that they had a specific promise for 10% of the equity. And our argument is that there was an offer to, to buy SynEv stock and that offer was made. And now it seems to be undisputed in the papers after the minority buyout. So they didn't know they had no specific offer. Okay. Now what Mr. LeMajor said it is in his email is that I have worked for private equity firms before, and I assume that I'm going to get offered something, but he didn't know what, he didn't know when, and how can you have a material offer a material conflict if you don't know what, and you don't know when. And to the extent that that potential. I mean, you can have, I mean, it means that you may be anticipating receiving some benefit. I don't think we have to measure it to make it a conflict. Do we? You don't, you have to measure it to make it a material conflict. I mean, is this trial court properly held the fact that these, that the individual defendants were going to continue to be employed? That's that was clearly known and that's not the basis of a conflict. The public documents that were submitted in connection with the buyout. They said that, you know, we may, we may compensate management. And so that possibility was always out there. The managers didn't know whether they would be retained. You know, it's often the case in connection with a, with a new owner comes in, he fired, they fired the manager, bring a new management. So not only did they know that they wouldn't get, they, they, they wouldn't know whether they would be retained in connection with, they didn't know whether they would be actually receive this equity benefit. And they didn't know if they did receive it, whether it would be one share, 10 shares, when they would get it. And that's what a material conflict is. And the Delaware courts are fairly clear, your honor, that some benefit that you get doesn't rise to the level of materiality. You've got to show, and this is why this is an issue of fact. You've got to show that the benefit that, that would ignore to the, to, was such that it created a material conflict such that it would skew their views of what, of how to deal with, with, with, with the, with the, with the minority unit holders. And that was never done. The court said, well, you know, and first of all, the court was based on this email and said you were promised something specific. And that clearly did not happen. And to the extent there was some amorphous opportunity out there, one that was disclosed in the documents that were publicly available, relating to the proposed buyout of the parent company, GTL. And there was no specifics, you know, how many shares, when you're going to get it. And that's all, that is all something that you could flush out in the court to determine whether there's a material conflict. So, and, and moreover, you know, the, the, the, the, the, the, the issue here is materiality. And it just was never even addressed by the, never addressed. And it clearly, as, as if you look at a Delaware cases, and we've cited these in our brief that some benefit, you know, because in connection with these kinds of buyouts, there's always some benefit that may inure to the, to the people, but what does it, does it arise to level B material and, and continued employment, for example. So, so these issues were all disclosed to the extent that they existed, but there were no, there was no solidity to it. So it wasn't material. And what the trial court did. Is that one inference? I mean, your whole point is that these inferences should be indulged in favor of the non-moving. Exactly. Exactly. But there are inferences that go the other direction. You're just saying that they should have been heard at a trial. Well, I think they should be heard at a trial, but I don't even agree that there's inferences that can be drawn in the other direction because what was clear was one, they weren't promised anything. Two, the individual defendants never talked to anybody at the, at the buyer of the parent company about what they would get. All as they knew was, and it was only one of the, one of the. Why the, why the vote to not allow the plaintiffs to discuss the sale with class members? What was that about? Well, first of all, in, in, in Mr. Majors, I'm sorry, in Mr. Ruby's affidavit, which the court disregarded, Mr. Ruby says that he told the individual, the, the plaintiffs in March, I'm sorry, May of 2011, which is like seven months before the buyout, that we plan to buy out the minority unit holders when we have the money. And that's a, that's a fact that the trial court ignored. So it was plenty of opportunity for the plaintiffs to go and talk to all the minority unit holders. They had lawyers, the very same lawyers they're using here and they had plenty of opportunity. This was not a secret. That's something that the trial court concluded, but that's not what the record shows. The record shows that seven months before this, the plaintiffs were told that once we get enough money, we plan to buy you out. Was that ever changed in terms of the willingness to have them communicate with the class members? No. I mean, they had, they, they knew about it. And the idea that this was somehow secret was an inference that was not supported by the record. So it wasn't as though there were competing inferences here. What was the vote then that, that I thought there was a vote and you can go ahead and answer this question. I thought there was a vote against allowing them to discuss the merger. No, I think there was, I know. I don't think there was a vote that they couldn't, couldn't do that. I think there was a vote to adjourn and they voted not to adjourn. They had, they had advised the plaintiffs in, in May of 2011 where if we get, when we get the money, we're going to buy out the company. Then they got were purchased by somebody who had the money. Then 10 days before the vote, they sent the SOR appraisal. Mr. Ruby got on the phone with the three plaintiffs says, this is what we plan to do 10 days from now. So when they got to the meeting, the plaintiff said, can we adjourn? And they were advised by their lawyers. They're advised by their lawyers. Say for sure. We're not going to adjourn. And your honor, there is. I think your time's expired. Thank you. I believe we have a Mr. Liebman next. Yes, your honor. May it please the court. My name is Joshua Liebman. I represent the investor defendants. At trial, the investor defendants were found not liable on either of the only two counts inserted against them. Count five, meeting and vetting breach of fiduciary duty and count six torches interference with contract. As such, we are participating today is Apple leads only the two issues germane to the investor defendants are the jury waiver issue and the leave to amend. I'd like to start with the jury waiver. Plaintiffs attempt to frame this issue in their briefs. The constitutional one, they emphasize the right to a jury is a constitutional right, but there is no dispute. The constitutional rights. And in particular, the right to a jury can be waived by contract. This is true in real law. There's also 200 Delaware law. Thus, the issue today is not a constitutional issue. It is a contractual issue. The question is whether the jury waiver provision in the LLC agreement is enforceable as to count six. The answer to that question. Well, it's also a question of enforceable by home. Yes, that is a question. You're on the force. And your client isn't a party to the contract that you're seeking to enforce. So explain to me how it's able to do that. Well, well, your honor, the first step in the analysis, the choice of law analysis. And we believe that Delaware law applies. We think it's clear that Delaware law applies under the, under Illinois conflict of law principles, the LLC agreements, Delaware choice of law provision controls. In our brief, we cite Walworth and Illinois Supreme court case and Freeman, the first district case in which the court applied Delaware law and tort claims based on the contractual choice of law provision. Are you distinguishing between the right to a trial versus the In your choice of law analysis. Well, in our choice of law analysis, we're focused on a contractual waiver of, of, of the right to jury trial. That's what the LLC agreement said. It says that the parties, the LLC agreements have waived the right to a trial for any claim of related to, or arising out of the LLC agreements under Delaware law, under certain circumstances, non-parties can enforce jury waiver provisions, just like the one in the LLC agreement here in plaintiff counsel's argument. He argued that there's no Delaware law controlling. First of all, that argument is waived. Plaintiffs did not make that argument in either of their first briefs, the opening brief or in their reply brief. They never addressed Delaware law on the issue of jury waiver. Not once. I think the issue is preserved. They may not have cited me to authority, but the issue is pretty well front and center. Well,  I believe that their argument is waived under rule three 41, but regardless, your honor, we do. We do cite to authority Delaware authority that's directly on point. And that holds that non-parties to a contract and force a jury waiver provision that the lead case that we cite is called. I'm sorry. Say again with the, he kind of went off mic there. Say it again. Sorry. It's the data centers, LLC, the 1743 holdings, LLC. And in that case, the contract issue was a lease and a part, a non-party to the lease with attempting to enforce the tenants, jury waiver provision in the lease. And the tenant argued, you're not party. How could you enforce this provision? I have the right to a jury. And the court said, no, in this situation, the non-party can enforce that provision. And this is what the court said. The lease does not limit the waiver to action brought against the parties who signed the lease. Instead, the waiver extends to quote any action, close quote. And that's exactly what we have. So by your construction, if it was your client that wanted a jury trial. And the plaintiff didn't. Would the plaintiff be able to enforce the waiver against you? Well, your honor, I don't know. That is, that's not the issue before the court. It is because you're, you're arguing for a contract that would have a provision that isn't mutually applied. That's right. Your honor. I don't believe that the plaintiffs under your scenario, your hypothetical would be able to enforce the provision against the non-parties of the contract, but our clients. How does that, how does that make sense? That kind of lack of mutuality that you get to decide solely, whether this case is heard in front of a jury, the plaintiff has nothing to say about it. It makes sense, your honor, because the plaintiffs are the parties to the contract. They entered into an LLC agreement. They counsel when they did it. The LLC agreement has a jury waiver provision, a broad jury waiver provision. It has a Delaware choice of law provision. And under Delaware law, that jury waiver provision is enforceable even by non-parties to the contract. So they were. Counsel, counsel, you're not addressing. Well, there in this particular situation, your honor, there isn't mutuality, but that's not what the law is. The law under Delaware law is that a non-party can enforce the jury waiver against the party. And that's, that's just what the law is. And here in Illinois, we respect choice of law provisions and contracts. We respect contractual provisions and we shouldn't go beyond the scope of the contract. And then start just, and start picking and choosing which parts of the contract can be enforced and which parts can be enforced. And when we apply. Well, I would imagine, I would imagine if the plaintiff attempted to enforce an obligation under  you'd have an issue against you'd have an issue with that. Well, I mean, you've got it. You've got it kind of coming and going here, right? You're not bound by any of the other obligations under the contract, but you get to enforce that waiver. Your honor. That's what the law is in Delaware. That's, that's, that's the law. The right to a jury trial arises under Illinois constitutional law. Why would Illinois allow another state to control the waiver of an Illinois constitutional right? Well, under Illinois law, your honor, a, the right to a, a jury can be waived by contract. Agree. So why shouldn't we determine the waiver under Illinois law? Because the contract that issue as a Delaware choice of law provision. And the parties agreed to be bound to in the plaintiffs to that Delaware choice of law provision. So when we're looking to that contract to decide whether the contract applies, we have to look to Delaware law. And in this particular instance, Delaware law said that non-party to the contract can enforce a broad jury waiver provision, just like the one that we have here. That is why it's a, it's a combination can ignore the choice of law provision. When you're analyzing the jury waiver, you have to look to the contract as a whole and, and, and enforce all the provisions of your honor. I only have two minutes left. I think I'd like to turn quickly to the, to the leave to amend your honor. Well, actually before I do that, your honor on the jury waiver issue, there are, there are a couple of other things. Plaintiff's reply brief asserted two arguments that were not two arguments and cited to new case law that were not argued or cited in the opening brief. We think that these arguments should be waived under rule three 41. In any event, I'm going to address them right now very quickly. If I can. When his first new argument is that the investor defendants quote, encouraged close quote, the trial court to apply Illinois law and thus cannot now ask the appellate court to apply Delaware law. This argument completely misrepresents the record. The investor defendants have consistently argued that Delaware law applies to the jury. When the jury waiver issue was briefed before judge Hanson, 2017, the investor defendants argued that Delaware law governed and cited Delaware law on the motion papers. That that's in the record. I'd give you the record sites. I think it would be helpful. Your honor. It's your time. Your time is up council. I'm going to ask one question though. There was a reference by judge Reddington that he felt that the rulings by judge Hanson were law of the case. That's not correct. Is it? Well, the case has to go up on appeal and back down before law of the case can apply. So if judge Reddington thought he didn't have discretion. To change those rulings that in itself becomes a problem. Doesn't it? I don't know which ruling specifically you're referring to your honor. I mean, I don't think judge Reddington wanted to revisit the jury waiver or, or the amendment. Well, the jury waiver and the amendment weren't re-raised before judge. They were raised before judge Hanson, you know, years ago. And then when the trial in front of judge Reddington went forward in 2022, nobody raised either one of those two issues again, but judge Reddington was referring to, I believe he said the law of the case were the damages. It wasn't allowed to come in regarding, you know, to try to expand the scope of damages. All right. Thank you. Thank you, your honor. All right. Mr. Kinnaid. Actually your honor. Sorry, Mr. Landon. Sorry. Thank you. Thank you. May it please the court. My name is Richard Landon. I represent SNAV and the GTL entities. When the circuit court entered judgment on the various entity defendant claims in 2023, it correctly ruled that UK-based GTL limited and SNAV limited, along with the investors who helped fund the buyout, did nothing wrong and rejected plaintiffs, aiding and abetting and tortious interference claims. Those rulings are unchallenged on the merits in this appeal. But at the same time, the court ruled that GTL USA, a non-acting vehicle that merely held units for those investors had somehow breached the LLC agreement and fiduciary duties in relation to the buyout. The court offered no explanation for this ruling. And it appears the judge Reddington simply imposed liability on GTL USA for no reason, other than the fact that judge Hanson had previously found the individual of dependents liable at summary judgment. Well, let me ask you a little bit about the agreement. Yes, your honor. My read of the agreement says that the managers could not have approved the merger, that, that, that, that was beyond their authority that they needed the approval of GTL, or it wouldn't happen. It says with the consent of GTL USA. So not only does GTL have the authority, only GTL has the authority to have had this waiver go through. I'm sorry to have this merger go through. Well, that's true, but the, the merger at the contract is clear that the, the, the merger can happen at any time. The minority shareholders can't prevent the merger. And the judge Hanson acknowledged that many times in his rulings, there was no, there was an absolute right to have the merger, to have a merger at any time. And yes, it is true that GTL USA has to consent, but that does not mean that it is responsible for the, the fairness of the deal that is done. Does it owe common law duties as the majority shareholder fiduciary? No, it does not under Delaware law. There is no default fiduciary duty for a non-managing member of an LLC. And the, the agreement is clear. The agreement expressly says that no member, not GTL USA, nor any of the minority unit holders, no member has a right or obligation in the management of the company. Other than it says with other than the right to elect managers to the board of managers, no member has any right or power to take part in the management or control of the company. Except for that one area. And then it does have a right. It has a right to determine whether there'll be a merger. Well, I don't think that, no, I don't, I don't think that that is a fair description of the management of the company. It says that the managers are responsible for determining the merger with the consent of GTL USA. Right. So the ultimate authority is GTL. So the merger doesn't happen without GTL saying it's going to happen. So it says that it has no managerial powers, that one power it does have. I don't agree that that's a power over the, that, that is a, a right to not have a merger imposed upon them. I think. To, to consent to a merger. I, I, I don't think that that is control over the terms of the merger. No, they certainly have the ability to consent to it, but I don't think that that imposes. Excuse me. Yeah. The ability to consent or reject. So they are the ultimate authority on whether there's going to be a merger. They certainly have to agree you're on it, but that does not, that does not give them any power or responsibility over how the merger is prepared and coordinated. It is, it is an ultimate, a veto power, so to speak. But that does not create a, a duty, a responsibility to ensure the fairness of the merger. That is not something that is imposed by Delaware law under the LLC statute. That's not something that's imposed by the terms of the contract. It's, it's important for us to, to note that plaintiffs have never identified what provision of the agreement they claim GTL USA is purported to have breached. I mean, below, they actually argued that it was section 5.4, but if they apparently they have abandoned that on appeal, they're now arguing that GTL USA somehow breached the agreement because it did manage the company, despite the agreement saying that it would not manage the company. That's not something that they argued, but again, they have not identified any conduct that would be portrayed as management of the company. They complain in their brief, as they did below, about the appointment of non-independent directors, but that's not management of the company that that's expressly provided for in the agreement itself. It's a right that GTL USA expressly had, and you can't say that it has breached the agreement by doing something that the agreement specifically says it can do. As for the fiduciary duty issue, I already mentioned, the LLC statute does not impose a default fiduciary duty on a majority shareholder under the LLC statute. The LLC statute is meant to provide parties with the right to explicitly govern how the company is going to be run in the agreement. Plaintiffs keep trying to bypass this fact by labeling GTL USA as a controlling unit holder. But again, they've not identified any facts that show actual control. They just use that label. We cite the CMS Holdings case, which points out that in Delaware, there has to be a specific inquiry into who actually wields the power and plaintiffs have offered no facts in support of that. They just throw around the label. The evidence at trial was clear that it was the investor defendants who effectively controlled the GTL entities and provided- Let me ask you a question. It says merger goes through. Parties to the merger, various participants, did they receive a benefit? I'm sorry, you're asking if GTL USA received a benefit? No, I'm asking if the people below it, all the other parties that we're talking about- The owners? Yes. The vertical owners? I think that the investors certainly received a benefit when the sale of the company was completed to CHS in 2014. But I'm not sure that- So the merger had nothing to do with the future success or the future economic benefits to the investors? Well, I think that the management was in agreement that it would be beneficial for IREH to have a single owner, that that would be- Well, then if the merger didn't occur, that benefit would not accrue. I agree, Ron. Well, then you did have control. That's an enormous aspect of control if you're preventing the parties from doing what they want to do. They didn't have anything to do with the management. It doesn't mean that they didn't have ultimate control over the merger was going to take place. I know I'm out of time, Your Honor. I do not agree that benefiting from the merger is the same as controlling the merger. I don't agree with that. How about approving the merger? I don't believe that that is the type of control that Delaware courts look to. No, it is consent and the right to reject a merger that they, that GTL USA did not believe was in its interest. I don't think that is the same kind of control that Delaware courts look for.  Thank you, Mr. Kennedy. Thank you, Your Honors. I'd like to address Mr. Landon's points first, which is he keeps saying that GTL did not act or control, but he hasn't. I'm sorry. I don't want you to make this personal. GTL has not addressed the manifest weight standard that they need here. The trial court listened to evidence at trial about the ways in which GTL acted and found GTL liable for the breaches. We provided evidence, and one of them was that GTL installed controlled directors, and that act eliminated the possibility of something that's very important in Delaware law. That's specifically, I think that is covered by the agreement, isn't it? That doesn't make them in control just because they do that. I'm not saying it makes them in control. I'm saying they acted in a way that caused the breach. You have to have the power to make the action happen, right? That just seems like a dead end for you. Well, there is no independent committee, and that's one of the elements of the breach. GTL took that act. Judge, the trial court heard that evidence and also heard that GTL used its counsel to control the offending meeting. These were some of the evidence that the trial court heard, but I don't think we heard anything from GTL either in its briefs or in its presentation about how they overcome the manifest weight of the evidence that the trial court found after trial that GTL is liable. I'd like to move over to the... I'm sorry. If there's a question, I can take it, but I'd like to move over to the other arguments from Mr. Cawley, which... Here's the basic starting point. There's a breach here. There's two parts to this breach. They needed an independent committee to review this transaction that did not happen, and they needed a vote of minority shareholders to approve this. That did not happen. Absence of those two things caused a breach. We heard Mr. Cawley say that the plaintiff... I'm going to recycle your argument about the posture below and have you address it here. How in the world is any of this decided on a summary judgment motion? Yeah, because the breach is clear. That's undisputed. Those two things... There's no other inference. No other inference can be drawn. There isn't a need to. It's undisputed facts. These two things... There's never a need to, but might there be an inference contrary to the one drawn at summary judgment? I mean, we know it's black letter law that you don't say, well, this affidavit is persuasive and this one's unpersuasive. As to the two points that there was no independent committee and there was no vote, that's undisputed. Those are just building materials for an ultimate conclusion that really... I don't know how you make that at summary judgment. Yeah, here's how it works there. The material conflict of interest, there's undisputed facts on this. One is they were controlled by the controlling shareholder. That's an inherent conflict under Delaware law. No disputed facts on that. And then there's also no disputed facts on this very one thing that's important, which is they actually did receive the equity in the company. There's no doubt that they had... They completed a transaction for which they had a material conflict of interest. They say, well, they didn't know. That's not relevant. That's not interesting. How can it taint their action if it's something that happens after the action? Certainly there's evidence to show that they knew before the action. Okay, go back to your other point. You said it didn't matter. I don't know how it couldn't matter. And I will address the fact issue, which is this undisputed fact that they knew before they completed the transaction. We provided it in the brief, which is the transaction, the vote occurs with the minority. But then they move forward before they complete the merger and file with Delaware. They all get their reward. That the trial court knew that the trial court was able to say that's a material conflict of interest. In addition to the inherent conflict of interest, which means that they had to engage in these two things. I think I saw my time flash, but I can answer more questions. Was the red light up, David? You still have one minute remaining. One minute remaining. Thank you. So, in that instance, there are facts in the record that the trial court relied on that are undisputed that highlighted an inherent conflict, a material conflict, which was they were part of the controlling shareholder, which under Delaware law gives them a material conflict. And they got this sweet equity. There's certainly no doubt in the record that Mr. LeMessurier knew. He has an email to that point. But the other defendants later acknowledge within days after the meeting with the plaintiffs, but before the transaction is completed, they get their sweet equity. So, that is the material conflict of interest. And the trial court was appropriate to rule on summary judgment that there was a breach and that they can be liable for that. Obviously, we complain about the damages. Thank you. Thank you, counsel. Mr. Cawley. Yes. Your Honor, there was a discussion between Mr. Ruby, and this was disclosed in his affidavit, and the owners about the possibility of buying equity at the price that everybody else got equity for after the buyout. The other three individual defendants didn't find out that they were going to get a share of the equity at all until Mr. Ruby decided to divide it among them. And that was in March. So, that was several months after the vote. And the plaintiffs keep talking about, you know, when the buyout became effective, and I think that's following something under Delaware law. The important date here is the date that the vote took place. They did not have any promise of anything at the time the vote took place. And Your Honor asked previously about, you know, the potentiality of a financial interest. That's discussed in the agreement. It's specifically addressed in paragraph 5.3K of the agreement, which says, no manager shall be disqualified from voting on any matter to be determined or decided by the board of managers solely by reason of such managers or his or her affiliates potential for financial interest in the outcome of the vote, provided the nature of such managers or his or her affiliates potential outcome was reasonably disclosed at the time of the vote. They were back to that conundrum again. You're saying that they don't know, but it was disclosed. Well, they don't have any promise. They don't have any details. The potentiality existed. The potentiality was disclosed. It publicly filed documents. So what the buyer said is, we may. We may give management the opportunity to buy equity. That was disclosed. Plaintiffs knew that. They got a link to these documents. And that's all the individual defendants knew. We may. Are they going to get one share two years from now? Are they going to get 10%? No one knew. Those details were decided way after the fact. So at the time we go on to this, the extent that he had a potential financial interest in the sense that the only one who really knew this was Mr. LeMessurier who had actually worked for a private equity firm. The others had no idea. And so he said later, I assumed I would get something because I worked for a private equity firm before. So there was nothing more than an amorphous potentiality. And there's no discussion by the trial court as to whether that's material or not. Finally, or not finally, but next. Mr. Kinney talks about a clear breach about an independent committee and a minority show to vote. That isn't first of all, under Delaware law, if the entire fairness standard applied, which it doesn't. The court, the classes are crystal clear. That those are things that the entire fairness doctrine is a burden shifting mechanism that the courts use, whether the defendants bear the burden or whether the plaintiffs bear the burden. And if you have an independent committee and a minority share, a unit holder vote, then the, the defendants have shifted the burden to the plaintiffs. But none of that is for, so it's not a requirement, even if entire fairness applied, but entire fairness does not apply because it's clearly removed by the agreement. In section 5.4 of the agreement. So they delineate the obligations of the individual managers. And it says no manager shall have any duty to the company or the members for conduct of the perfect prefers other than the duty set forth here. And what are those? And what are those are willful failure to deal fairly. But violation of criminal law. Profiting from a transaction or willful misconduct. Let's look at sentence three. You have the duty to discharge their duties in good faith. Right. The manner that they believe is in the best interest of the company. Right. And the care ordinarily prudent person would exercise, which is essentially the fundamental pieces of a fiduciary duty. Well, that, well, that's right. But then it says, and no manager shall. So it talks about specifically limiting their liability. If you go, there's another section that specifically addresses that and that section 5.6. And it says the maximum extent permitted by Delaware law, no manager shall be personally liable except for. Sure. That's about the remedy. That's not about the duty. Oh, no, your honor. I respectfully disagree. I think it lays out contractually what a liability would be under the agreement. And it says that maximum extent prevented by law. These are the only things you can be held liable for. And, and, and it, and it lays out a willful failure to deal fairly, you know, criminal violation, improper product profit. And so it's, and it says it twice in section 4.5 and 4.6. And moreover, your honor, even if you go back to the original fiduciary duty that you talked about, good faith, this is a manner. The manager believes is in the best interest of the company. That's it. That is a subjective standard. You can't decide that on summary judgment. And the final point I'd like to make your honor is that one of the things that has been glossed over by the, by the plaintiffs here is these individual defendants relied upon their lawyer and they relied upon the, the valuation expert. And there's a provision in Delaware law, a section one point section one, four, one E of the Delaware code. It says board members and managers of LLCs are fully protected to the extent that they rely upon their lawyers and to the extent that they rely upon valuation experts. And so they are full. Thank you. Your time is expired. We will be taking the case under advisement and issuing a decision in due course, but there's two matters. I just wanted to put on the record. First of all, we know that of the common law record in this case, more than half of the content of the common law record is impounded sealed. As some people would say, but it's a different term in Illinois. That's a little bit surprising. And the courts do have an independent obligation to make sure that if something is sealed, a public record of public business, That there'd be a strong justification for it. It may very well be that we're going to ask the trial court to revisit the propriety of the volume of material that has been sealed in this case. The second thing is I'm going to tell you that we have made a note that we will not issue a decision on this case prior to March 15th. And if March 15th comes in, then it'll happen when it happens. But the reason we're delaying is it's clear here, although this case is not decided, that it could send a lot of you back to square one, right? Some of the relief that's being asked here could send you back to square one. In that circumstance, it seems to me that if the parties were to decide that they wanted to mediate the case, we would hold the case longer. If you communicate that by agreement to us prior to March 15th. Just want to make sure that you have that option, not asking or ordering anybody to do anything. We just want to make sure to facilitate it. If that's what the parties decide to do. All right. Thank you all for your arguments.